AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

NOV 13 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
INFORMATION ASSOCIATED WITH THE ACCOUNT
██████████ .COM, WHICH IS STORED AT THE
PREMISES OF 1&1 INTERNET, INC.

)
)
)
)
)
)

Case: 1:17-mj-00854
Assigned To : Chief Judge Howell, Beryl A.
Assign. Date : 11/13/2017
Description: Search and Seizure Warrant

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A2.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B2.
This warrant is sought pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 951; | Acting as a foreign agent without notice to the Attorney General; |
| 18 U.S.C. § 1014 | False Statements to a financial institution; |
| 18 U.S.C. § 1344 | Bank Fraud |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*signature*
Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___11/14/2017___

_____
*Judge's signature*

City and state: Washington, D.C. _____

Hon. Beryl A. Howell, Chief U.S. District Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
ACCOUNT ██████████ COM,
WHICH IS STORED AT THE PREMISES
OF 1&1 INTERNET, INC.

**UNDER SEAL**

Case: 1:17−mj−00854
Assigned To : Chief Judge Howell, Beryl A.
Assign. Date : 11/13/2017
Description:  Search and Seizure Warrant

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, ████████████ being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information associated with the email address provided for the email ██████████ **com** (hereinafter the **"Target Account"),** that is stored at premises owned, maintained, controlled, or operated by 1&1 Internet, Inc. ("1&1"), an electronic communication and/or remote computing service provider headquartered in Sunnyvale, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require 1&1 to disclose to the government copies of the information (including the content of communications) further described in Attachment A.  Upon receipt of the information described in Attachment A, government-authorized persons will review that information to locate the items described in Attachment B.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that MICHAEL DEAN COHEN has committed violations of 18 U.S.C. § 1014 (false statements to a financial institution), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), as well as 18 U.S.C. § 951 (acting as an unregistered foreign agent) and the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq*.  There is also probable cause to search the information described in Attachment A for evidence, contraband, fruits, and/or instrumentalities of these crimes, further described in Attachment B.

5.      On or about October 23, 2017 this Court has issued an order pursuant to 18 U.S.C. § 2703(d) directed at 1&1 to produce non-content records for the **Target Account**.  1&1 produced such records, which showed that the **Target Account** contained emails from the approximate period of March 2017 through the present.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  *Id.*  §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States (including a magistrate

judge of such a court) . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

7.      As described below, the FBI is investigating COHEN in connection with, *inter alia*, statements he made to a known financial institution (hereinafter "Bank 1") in the course of opening a bank account held in the name of Essential Consultants, LLC and controlled by COHEN.  The FBI also is investigating COHEN in connection with funds he received from entities controlled by foreign governments and/or foreign principals, and the activities he engaged in the United States on their behalf without properly disclosing such relationships to the United States government.

### **A.    Michael Cohen**

8.      According to press reports and bank records collected during the investigation, COHEN served for over a decade as an executive in the Trump Organization, an international conglomerate with real estate and other holdings controlled by President Donald Trump prior to his presidency.   Until approximately January 2017, COHEN was reported to have held various positions within the Trump Organization.  During an interview with *The Wall Street Journal* in or around January 2017, COHEN described his role as being "the fix-it guy . . . . Anything that [then-President-elect Trump] needs to be done, any issues that concern him, I handle."[1]

9.      In or around January 2017, COHEN made public statements that he would resign from the Trump Organization to serve as the personal attorney for President Trump (serving as an attorney to the President in his personal capacity, as opposed to as a member of the White House Counsel's Office).  COHEN recently has identified himself publicly—including on his personal

---

[1] "Intelligence Dossier Puts Longtime Trump Fixer in Spotlight," *Wall Street Journal*, Jan. 11, 2017.

Twitter account—as a personal attorney for the President.  Similarly, in emails recovered from a

Google email account used by COHEN (the "Gmail Account"), COHEN describes himself as a

personal attorney for the President in his signature block.

### B.   Essential Consultants, LLC

10.   In or around June 2017, federal agents reviewed information supplied by Bank 1

based on activity that Bank 1 had observed from a number of accounts related to COHEN.

According to information provided by Bank 1, COHEN has been a customer since approximately

June 2011 and controls several checking and loan accounts, some in his personal name and others

in the names of corporate entities.  Agents have subsequently reviewed documents and records

provided by Bank 1 related to COHEN and these various accounts.

11.   Records provided by Bank 1 show that on or about October 26, 2016, COHEN

opened a new checking account in the name of Essential Consultants, LLC ("Essential

Consultants"); COHEN was the only authorized signatory on the account.  On the paperwork

associated with opening the account, COHEN listed his Trump Organization Account for contact

purposes.  Corporate records show that Essential Consultants is a Delaware entity formed by

COHEN on or about October 17, 2016.

12.   According to information provided by Bank 1, when COHEN opened the Essential

Consultants account, he made the following representations during the course of Bank 1's know

your customer ("KYC") procedures:

   a.   He was opening Essential Consultants as a real estate consulting company to collect

        fees for investment consulting work;

   b.   He intended to use his experience in real estate to consult on commercial and

        residential real estate deals;

c. His typical clients were expected to be high net-worth domestic individuals; and

d. His purpose in setting up the account was to keep the revenue from his consulting—which he said was not his main source of income—separate from his personal finances.







**D.      Representations about Net Worth to Financial Institutions**

20.      In connection with the ongoing investigation, the government has reviewed other representations COHEN has made to Bank 1 and other financial institutions, including representations regarding his net worth and financial position.   A review to date has identified substantial inconsistencies in COHEN's stated assets, liabilities, and net worth in separate submissions between 2014 and 2017.

---

[6] Records obtained from Bank 3 confirm the transfer and the notation.

21.     For example, in or around October 2014, COHEN submitted a "Statement of Financial Condition" as of August 1, 2014 to Bank 1. The document purported to depict COHEN's various assets and liabilities, as well as his net worth. On the document, COHEN claimed to have assets totaling approximately $99,420,000 and liabilities of approximately $23,550,000. On the same document, COHEN claimed to have a net worth of approximately $75,870,000.

22.     In or around February 2016, in connection with obtaining the $500,000 HELOC described above, COHEN submitted a summary of his assets, liabilities, and net worth to Bank 1. COHEN claimed to have assets totaling approximately $63,435,315 and liabilities of approximately $10,419,209. On the same document, COHEN claimed to have a net worth of approximately $53,016,106.

   a. In addition, documents collected from Bank 1 show that COHEN made representations to Bank 1 that he had no contingent liabilities, when in fact, based on documents COHEN submitted to another FDIC-insured financial institution ("Bank 5," described below), COHEN and his wife had personally guaranteed over $20 million in loans associated with taxi medallions. In or around August 2017, an employee of Bank 1 who served as COHEN's main point of contact at the bank confirmed that COHEN did not disclose any contingent liabilities, despite that being a standard question that he had to answer whenever seeking monies.

23.     In or around May 2017, COHEN was part of a group of real estate investors that sought a $2 million line of credit from an FDIC-insured financial institution ("Bank 4"), which already held a $17 million loan on a property owned by the real estate group. In connection with the loan request, Bank 4 requested COHEN submit a "net worth letter" in order to assess his financial condition. On or about May 17, 2017, in response to the request, COHEN submitted a

letter to Bank 4 from an accountant. The letter stated that based on representations by COHEN to the accountant, it was the accountant's understanding that as of May 1, 2017 "his [COHEN's] current cash position and his various real estate investments holdings . . . [are] currently in excess of $20.0 million." The letter did not disclose any liabilities.

      a. In November 2017, the government interviewed the accountant who signed the May 2017 letter sent to Bank 4 ("Accountant 1"). The accountant explained that COHEN had directed him to write the letter and specifically only to identify the cash and real estate investment holdings, without identifying any other liabilities that would offset those holdings.

24.     Bank records show that COHEN has a lending relationship with a known FDIC-insured financial institution ("Bank 5") collateralized by New York taxi medallions. Records show that entities controlled by COHEN have approximately $20,000,000 in notes payable to Bank 5.[7] According to interviews with Bank 5 employees, throughout 2017 COHEN repeatedly has sought to renegotiate the terms of the loans and sought some debt relief from Bank 5 on these loans. During the course of these negotiations, on or about June 8, 2017, COHEN sent Bank 5 a "Statement of Financial Condition" as of May 1, 2017. The document submitted by COHEN was prepared by the same accountant as the letter submitted to Bank 4 on or about May 17, 2017 (which said that COHEN's "current cash position and his various real estate investments holdings . . . [as of May 1, 2017 are] currently in excess of $20.0 million" and did not disclose any liabilities). In contrast to

---

[7] The value of the collateral backing these loans (the taxi medallions) currently is worth substantially less than the loans. In May 2017, COHEN himself estimated the medallions to be worth only $13,950,000. Based on recent medallion sales, the collateral is potentially worth much less. Documents collected from Bank 5 show that COHEN and his wife also signed agreements making them personal guarantors of the $20,000,000 in loans.

the document submitted to Bank 4, on the document submitted to Bank 5, however, COHEN claimed to have a net worth of approximately $2,825,000.[8]

     a.  According to Accountant 1, at the time he prepared both the May 2017 Statement of Financial Condition and the letter sent to Bank 4, he had believed that COHEN was going to give ***both*** documents to Bank 4 in order to give an accurate representation of his financial condition.  Accountant 1 stated that if he had been told the letter would be submitted to Bank 4 as a stand-alone document, without the Statement of Financial Condition disclosing the outstanding liabilities, he would not have prepared the letter as directed.

### E.   Foreign Transactions in the Essential Consultants Account

25.   As set forth above, in or around October 2016, COHEN made several representations to Bank 1 in connection with the bank's KYC review process, including that he expected funds deposited into the Essential Consultants account would constitute income from his consulting work, that his consulting clients were expected to be domestic (that is, within the United States), and that he expected his clients to be U.S.-based, high-net worth individuals.

26.   Records obtained from Bank 1 show substantial transactional activity that appears to be inconsistent with these KYC representations.  Bank 1 records show that the account received numerous deposits from foreign businesses and entities that do not reflect the stated client profile for the residential and commercial real-estate consulting services ostensibly being provided by Essential Consultants.[9]  Moreover, public records, media reports, and other publicly available

---

[8] COHEN claimed to have assets totaling approximately $41,955,000 and liabilities of approximately $39,130,000.

[9] By contrast, based on a review of emails obtained from the **Target Account** and records obtained from Bank 1, the Essential Consultants account has not received any funds from residential or commercial real-estate consulting services.

sources, as well as emails obtained during the course of the investigation, indicate that some of these companies have significant ties to foreign governments or are entities controlled by foreign governments.

27.     A search in or around July 2017 of the U.S. Department of Justice database of all agents currently or previously registered under the Foreign Agent Registration Act ("FARA") confirmed that neither COHEN nor Essential Consultants is or has been a registered agent of a foreign government.[10]   All FARA registration is handled by the U.S. Department of Justice's National Security Division in Washington, D.C.

i.     Deposits by Columbus Nova, LLC

28.     Telephone records related to COHEN's cellular telephone show that on or about November 8, 2016, the day of the presidential election, a telephone registered to COHEN exchanged the first in a series of text messages with the CEO of Columbus Nova, LLC ("Columbus Nova").  Between approximately November 8, 2016 and November 6, 2017, telephone records show over 1,000 contacts (calls and text messages) between COHEN's cellular telephones and the CEO of Columbus Nova.  Telephone records show no such text messages or telephone calls between COHEN's cellular telephone and the CEO of Columbus Nova prior to November 8, 2016.

29.     Public records show that Columbus Nova, LLC is an investment management firm controlled by Renova Group ("Renova"), an industrial holding company based in Zurich, Switzerland.  According to public news accounts, Renova is controlled by Viktor Vekselberg, a wealthy Russian national.  Public news accounts also report that Vekselberg is an oligarch with various connections to Russian President Vladimir Putin who publicly met with Putin as recently

---

[10] The database is publicly available at https://www.fara.gov/.

as in or around March 2017.[11]   According to the news articles, Vekselberg and Renova currently are involved in various infrastructure projects in Russia, such as the building of an airport in Rostov in advance of the 2018 FIFA World Cup, which is to be held in Russia.   Vekselberg has been involved in various symbolic acts seen to be in the Russian national interest, such as the purchase and repatriation of historic Faberge eggs.[12]

30.   On or about January 10, 2017, COHEN received an email from the CEO of Columbus Nova with the subject "About us / Russian Union of Industrialists and Entrepreneurs." The CEO told Cohen, "This is the organization that Victor was mentioning yesterday. . . . He is the head of this international relations committee of this group. . . . Will follow up with more later." Similarly, records obtained the Gmail Account show that COHEN had a calendar entry entitled "Meeting with Victor," scheduled for on or about March 7, 2017 at the location "Renova."

31.   According to records obtained from Bank 1, since the beginning of 2017, the Essential Consultants bank account received seven deposits, each in the amount of $83,333 (for a running total of $583,332.96).   The funds for all deposits—six of which were wire transfers and one by check—came from an account at another bank held in the name of Columbus Nova, LLC. The following table summarizes the funds transferred to date:

| APPROXIMATE DATE | DEPOSIT |
|---|---|
| January 31, 2017 | $83,333.00 |

---

[11] *See, e.g.*, "Russia's Putin Meets Tycoon Vekselberg," *Reuters*, Mar. 14, 2017.

[12] On or about September 5, 2016, media outlets reported that Russian authorities arrested two of Vekselberg's closest associates in connection with allegations that a subsidiary had paid over $12 million in bribes to Russian government officials.   Some media accounts speculated that the arrest of Vekselberg's associates, as well as the commensurate searches of Renova's head office, were intended as a warning from the Russian government that it wanted some form of cooperation or value from Vekselberg. *See, e.g.*, "Another Billionaire Incurs Putin's Wrath," *Bloomberg*, Sept. 6, 2016.

| APPROXIMATE DATE | DEPOSIT |
|---|---|
| March 2, 2017 | $83,333.33 |
| March 31, 2017 | $83,333.33 |
| April 28, 2017 | $83,333.33 |
| June 1, 2017 | $83,333.33 |
| June 30, 2017 | $83,333.33 |
| August 1, 2017 | $83,333.33 |

32.     Records obtained from the financial institution ("Bank 2") where the Columbus Nova account is maintained illustrate that the funds used to pay COHEN originated from a second account in the name of Renova US Management LLC ("Renova US"). For example:

    a. On or about January 27, 2017, the Columbus Nova account at Bank 2 received a deposit of $83,333 from an account held in the name of Renova US. The same day, a check for $83,333 drawn on the Columbus Nova account at Bank 2 was made out to Essential Consultants LLC.

    b. On or about March 2, 2017, the Columbus Nova account at Bank 2 received $83,333 from the Renova US account. The same day, the Columbus Nova account was used to $83,333 the Essential Consultants account at Bank 1.

    c. On or about March 31, 2017, the Columbus Nova account at Bank 2 received $83,333 from the Renova US account. The same day, the Columbus Nova account was used to wire $83,333 to the Essential Consultants account at Bank 1.

    d. On or about April 28, 2017, the Columbus Nova account at Bank 2 received $83,333 from the Renova US account. The same day, the Columbus Nova account was used to wire $83,333 to the Essential Consultants account at Bank 1.

ii.     Wire Transfers from a Kazakhstani Bank

33.     On or about May 6, 2017, COHEN sent an email from the Gmail Account to an individual believed to be Kenges Rakishev. Open-source records identify Kenges Rakishev as the majority shareholder of Kazkommertsbank, another Kazakhstani bank that controls BTA Bank. Rakishev is also the son-in-law of Kazakhstan's ambassador to Russia. According to press reports, BTA Bank recently was implicated in a multi-billion dollar scandal in which a unit of BTA had been used to issue billions of dollars' worth of credit for property development and other deals in Russia, Ukraine, and Belarus that subsequently went bankrupt.[13]

34.     In the email sent from the Gmail Account on or about May 6, 2017, COHEN wrote that it was an "honor to spend the evening with you" and that "[t]here are definitely a lot of mutual relationships between the two of us that require our assistance." COHEN also proposed a meeting the following week.

35.     On or about May 10, 2017, COHEN sent an email from the **Target Account** to an individual believed to be a BTA Bank executive with an attachment bearing the filename "BTA-1." The attachment contained a purported invoice for $150,000 from Essential Consultants LLC to BTA Bank in the Republic of Kazakhstan. The invoice, identified by invoice BTA-101 referred to a "monthly consulting fee" pursuant to a "Services Agreement entered into on the 8th of May, 2017." The invoice was directed to the attention of Kenges Rakishev. COHEN also stated he the

---

[13] More specifically, according to a *Forbes* article published in or around February 2017, BTA Bank's auditors PricewaterhouseCoopers identified a $10 billion discrepancy on the bank's balance sheets. Subsequent investigation by forensic accountants revealed that a unit of BTA had been used to issue billions of dollars' worth of credit for property development and other deals in Russia, Ukraine, and Belarus. The investigation also indicated that funds illicitly had been removed from the bank through shell companies set up in the names of executives' family members. *See* "How To Get Back A Lost $10B: One Bank's Tale in Europe's Biggest Alleged Fraud," *Forbes*, Feb. 6, 2017.

he would the Certificate of Incorporation for Essential Consultants to the email (but appears not to have attached the document).

36.     On or about May 15, 2017, COHEN received an email through the Gmail Account from an individual purporting to be Nurlan Abduov.  According to open source information, Abduov is a shareholder of Kazkommertsbank where between April 28, 2016 and July 31, 2017 he held a position of Managing Director and member of the Board of Directors.  In the email, Abduov told COHEN that he was contacting him "on behalf of Kenes [*sic*] Rakishev."  In the email, Abduov also stated that the "[w]anted to check how we can start to work with you."  In addition to COHEN, Abduov's email was addressed to Kenges Rakishev at a different email address.

37.     According to Bank 1, on or about May 22, 2017, the Essential Consultants bank account at Bank 1 received a $150,000 deposit from an account at Kazkommertsbank.  According to Bank 1, the listed account holder at Kazkommertsbank was a second Kazakhstani bank named BTA Bank, AO.  Bank 1 reported that a message accompanying the wire payment indicated that the agreement was a "monthly consulting fee as per Inv BTA-101 DD May 10, 2017 consulting agreement W/N DD 08 05 2017 CNTR W/NDD 08/05/2017."

38.     Non-content information obtained from the **Target Account** pursuant to an 18 U.S.C. § 2703(d) court order shows that COHEN, Rakishev, and others from BTA Bank remain in routine contact.  Between approximately May 5, 2017 and October 9, 2017, COHEN, through the **Target Account**, exchanged over eighty emails with email accounts controlled by Rakishev and other BTA employees or executives.

iii.     Deposits by Korea Aerospace Industries Ltd.

39.     According to Bank 1, on or about May 10, 2017 and June 9, 2017, the Essential Consultants bank account received two deposits in the amount $150,000 (totaling $300,000

between the two deposits) from a bank account in Seoul, South Korea. According to documents obtained from Bank 1, the account holder from which the money was sent is Korea Aerospace Industries Ltd. ("KAI"). According to its public website, KAI is a South Korea-based company that produces and sells fixed-wing aircraft, helicopter aircraft, and satellites.

      a. Public news accounts report that KAI has numerous interests in the U.S. defense industry. For example, press accounts from early 2017 indicate that KAI has partnered with Lockheed Martin to bid later this year on a $16 billion U.S. Air Force T-X Trainer Jet Replacement Program. Likewise, on or about October 31, 2017, public media reported that KAI had received an order worth $48.8 million for the maintenance, repair, and overhaul of 90 F-16 fighter jets operated by the U.S. Air Force.

40. On or about April 28, 2017, COHEN sent an email from the Gmail Account to another individual with the subject "Re: K Project." In the email, COHEN attached a document purporting to be a "Consulting Agreement" between KAI and Essential Consultants LLC that was to enter into effect on May 1, 2017. The document indicates that Essential Consultants would render "consulting and advisory services, as requested" by KAI; no further information was provided regarding the nature of the consulting and advisory services to be provided. The document also indicated that KAI would pay Essential Consultants "a consulting fee of One Million Two Hundred Thousand ($1,200,000.00) US Dollars," disbursed through eight $150,000 installments between May 2017 and December 2017.

41. According to publicly available materials and press accounts, as well as the company's financial disclosures, the Republic of Korea (South Korea) government has significant ties to KAI. KAI itself was formed in 1999 as part of a government-led effort to consolidate South

Korea's aerospace industry manufacturers into a new single entity. KAI holds the exclusive rights for all of the government's military logistics and aerospace projects.[14]   The South Korean government, through the Korea Development Bank, is the largest shareholder in KAI and its largest debt holder.[15]   According to information provided by Bank 1, messages related to the transfer of funds from KAI indicated that the purpose of these payments was "consulting services."

42.     Non-content information obtained from the **Target Account** pursuant to an 18 U.S.C. § 2703(d) court order shows that COHEN has communicated with KAI employees. Between approximately May 21, 2017 and October 23, 2017, COHEN has sent seven emails from the **Target Account** to email addresses at KAI's email domain (koreaaero.com) and has received three emails from KAI email addresses.

**F.     Payments to Essential Consultants in Connection to Political Activities**

43.     In addition to the sources of money connected to foreign governments that were paid into the Essential Consultants account as set forth above, the account also was used to receive  funds from U.S. and foreign corporations who appear to have approached COHEN in connection with political objectives in the Trump administration.

i.     AT&T Inc.

44.     Beginning in or around April 2017, records from Bank 1 show the Essential Consultants account has received approximately $300,000 in wire payments from a bank account associated with the telecommunications company AT&T Inc. ("AT&T"), as summarized below:

---

[14] *See, e.g.*, Andrew Tylecote & Francesca Visintin, *Corporate Governance, Finance and the Technological Advantage of Nations* (2008), at 165–66; International Business Publications, *Korea South: A "Spy" Guide* (2016), at 229–31.

[15] KAI, Annual Report 2014, *available at* https://www.koreaaero.com/upload_images/new_pdf/ annual/PDF/Annual_report_eng_2014.pdf.

| APPROXIMATE DATE | DEPOSIT |
|---|---|
| April 14, 2017 | $100,000 |
| June 13, 2017 | $50,000 |
| July 17, 2017 | $50,000 |
| August 16, 2017 | $50,000 |
| September 6, 2017 | $50,000 |

45.     In or around October 2016, AT&T announced its intention to acquire media conglomerate Time Warner Inc. ("Time Warner") for approximately $85 billion, creating one of the largest integrated media-and-telecommunications companies in world.  Given the size of both companies and the potential antitrust implications, AT&T submitted the proposed deal to the U.S. Department of Justice for review.  As of early November 2017, public media reports indicate the Department of Justice had not made a decision about the proposed acquisition and was, according to one report, "preparing for litigation in case it decides to sue to block the deal."[16]

46.     While campaigning for president, President Trump made statements indicating he disapproved of the proposed merger.  For example, on or about October 22, 2016, at a rally in Pennsylvania, then-candidate Trump stated, "[a]s an example of the power structure I'm fighting, AT&T is buying Time Warner and thus CNN, a deal we will not approve in my administration because it's too much concentration of power in the hands of too few."  After his election, the president-elect continued to make similar statements.  On or about January 17, 2017, president-elect Trump stated "I have been on the record in the past of saying that [the proposed acquisition

---

[16] "U.S. Weighs Suit Against AT&T's Deal for Time Warner," *Wall Street Journal*, Nov. 2, 2017.

is] too big and we have to keep competition." In the January 2017 statement, however, the president-elect added the caveat, "I haven't seen any of the facts, yet."

47.     Beginning in or around January 2017, telephone records show that that COHEN began to have contact with executives at AT&T. For example, on or about January 20, 2017, records show that a telephone number belonging to COHEN called a telephone registered to a senior vice president of AT&T responsible for legislative affairs (the "AT&T Senior VP"). According to public media reports, on or about January 12, 2017, the AT&T Senior VP and another high-ranking AT&T executive had met with president-elect Trump in New York.

48.     On or about February 3, 2017, records obtained from AT&T show that COHEN had a seventeen-minute telephone call with a consultant for AT&T who handled global public affairs for the company (the "AT&T Consultant"). Shortly before the call, the AT&T Consultant sent an email to the AT&T Senior VP with the subject "Cohen backgrounder" and wrote, "I am meeting with him at 10:30 this morning to finalize contract and talk w/ potential scope of work." Shortly after the call, the AT&T Consultant 2 texted the AT&T Senior VP: "Just had Cohen call. Oh my. All good. Eager to tell you about it."

49.     On or about February 6, 2017, records obtained from AT&T show that the AT&T Consultant emailed the AT&T Senior VP with the subject line "Michael Cohen notes." The email, which appears to recount a conversation with COHEN, stated that the AT&T Consultant believed COHEN would be "in town tomorrow – meeting w/ POTUS,"[17] and that COHEN "made the point several times that he doesn't list clients, doesn't talk about clients and hopes we won't be publicizing that he's working w/ us. I assured him. And I hope he means it."

---

[17] The acronym "POTUS" stands for "President of the United States."

50.     On or about February 15, 2017, records obtained from AT&T show that COHEN

met with the AT&T Senior VP and the AT&T Consultant at the company's office in Rockefeller

Plaza.  Shortly after the meeting, COHEN used the Gmail Account to send an email to both

individuals, writing "[g]reat to finally meet you today.  Lots to do... Can you please send me the

executed agreement so that I might counter sign and return to you?"  The AT&T Consultant

responded to COHEN at the Gmail Account, "[g]reat meeting you as well.  I'll send contract over

tomorrow."

51.     Records obtained from the Gmail Account reveal a drafted contract between

Essential Consultants and AT&T.  The contract contemplates that Essential Consultants "shall

render consulting and advisory services to the Company [AT&T]," adding that AT&T would

"advise Consultant of those issues and matters with respect to which AT&T Services desires

Consultant's assistance and advice."  The contract calls for AT&T "to pay the Consultant for his

services . . . a consulting fee of Fifty Thousand ($50,000.00) Dollars . . . per month."

52.     According to records obtained from AT&T, on or about April 11, 2017, COHEN

and the AT&T Consultant had a call to discuss the first payments to COHEN.  On or about April

12, 2017, the AT&T Consultant emailed the AT&T Senior VP with the subject "Cohen," writing:

"Wants the talkers we discussed < says he's going to be w/ potus this weekend.  You want me to

work w/[REDACTED]?"  The AT&T Consultant then forwarded his email to two other AT&T

employees and arranged for a conference call to discuss the "talkers" referred to in the first email.

53.     On or about May 12, 2017, the AT&T Consultant emailed COHEN at the Gmail

Account, asking "Hey Michael, Have you heard anything new re merger?"  COHEN responded,

"Please call me on my private (client only) call num..."

subject "Recess appointment," writing that "[REDACTED] is talking w/ T sometime in the next 2 days. Cohen is seeing him Thursday. I asked [REDACTED] to add a couple questions to the Morning Consult poll we use – should give us some strong numbers to bolster the argument for doing."

54.     Communications between COHEN and employees of AT&T have continued recently. For example, on or about September 11, 2017, COHEN, using the Gmail Account, sent the AT&T Consultant two emails, including one with the message "[s]peak to you tomorrow." The other email was a news article entitled "Michael Cohen Would Take a Bullet for Donald Trump," which profiled COHEN and his relationship to President Trump.

55.     Non-content information obtained from the **Target Account** pursuant to an 18 U.S.C. § 2703(d) court order shows that COHEN has also communicated with AT&T employees through the **Target Account**. Between approximately April 20, 2017 and October 4, 2017, COHEN has sent approximately sixteen emails from the **Target Account** to email addresses at AT&T's email domain (att.com) and has received fourteen emails from AT&T email addresses.

ii.     Novartis Investments, SARL

56.     Bank 1 records also show that since in or around April 2017, the Essential Consultants account at Bank 1 has received deposits totaling $599,880 from a Swiss bank account held in the name of Novartis Investments, SARL, as summarized below:

| APPROXIMATE DATE | DEPOSIT |
| --- | --- |
| 4/5/2017 | $99,980 |
| 5/15/2017 | $99,980 |
| 6/14/2017 | $99,980 |
| 7/17/2017 | $99,980 |

| APPROXIMATE DATE | DEPOSIT |
|:---:|:---:|
| 8/14/2017 | $99,980 |
| 9/1/2017 | $99,980 |

Novartis Investments, SARL is the in-house financial subsidiary of the Swiss pharmaceutical company Novartis International AG ("Novartis").

57.     While campaigning for president, then-candidate Trump made statements indicating he disapproved of the prices of pharmaceutical drug prices.  For example, on or about January 25, 2016, candidate Trump suggested that Medicare could save $300 billion a year through stronger negotiation with major pharmaceutical companies but that the government did not do so "[b]ecause of the drug companies."  After his election, president-elect Trump made similar statements.  On or about January 11, 2017, president-elect Trump stated, "We've got to get our drug industry back.  Our drug industry has been disastrous. . . .  We're going to start [competitive] bidding and we're going to save billions of dollars over a period of time."

58.     On or about January 16, 2017, COHEN, using his Trump Organization email address, sent a contact an email asking him to pass a message along to a senior executive of Novartis ("Novartis Executive 1").  The message was a link to an article suggesting that the Trump Administration would consider loosening drug approval standards as a way to bring down costs of pharmaceutical drugs.  Emails obtained from Novartis show that COHEN's contact did in fact forward the email to Novartis Executive 1, who in turn sent the article to an assistant with a request to print out the article.

59.     On or about January 31, 2017, Novartis Executive 1 met with President Trump as part of a meeting between pharmaceutical drug company executives and the new White House administration.  According to public reports, during the meeting President Trump "vow[ed] to

speed the approval of new medicines and ease regulation."

60.     On or about February 2, 2017, COHEN received an email from the above-mentioned contact with Novartis Executive 1's information.   The information provided both Novartis Executive 1's official email address and a private email address.   On or about February 3, 2017, Novartis Executive 1 emailed COHEN, "Hi Michael, I received your email.  This is the best way to reach me.  Let's set up a phone call."  COHEN subsequently received a calendar invitation for a telephone call with Novartis Executive 1 on or about February 10, 2017.

61.     On or about February 13, 2017, COHEN sent an email from the Gmail Account to Novartis Executive 1 with the subject "Novartis Consulting Arrangement," writing that he was attaching "my pro forma consulting agreement."  Over the subsequent days, emails indicate that COHEN and different employees from Novartis negotiated the terms of a contract.  On or about February 15, 2017, another Novartis executive ("Novartis Executive 2") sent an internal email to another Novartis executive ("Novartis Executive 3"):

> I just spoke with Michael Cohen a few minutes ago.  He is generally fine with the contract, but want some changesto [*sic*] the Statement of Work, which he wanted to be more consulting/advisory and less lobbying.  He made clear that he would not be lobbying for us (or others) and that he would not be registering as a lobbyist.

On or about February 16, 2017, Novartis Executive 2 sent another email to Novartis Executive 3:

> I just spoke with Michael Cohen and received mark-ups of the Agreement and SOW [Statement of Work] from him . . . . Regarding the SOW, he has pared it back substantially so that it no longer provides details as to precisely what he will do for us.  I pushed him on this, but in his view it would be safer for both of us to say less.

62.     On or about February 17, 2017, COHEN through the Gmail Account received an email from Novartis Executive 2 with the subject "Re: Consulting Agreement" and the message "Michael—Attached is our agreement, signed on behalf of Novartis International AG.  This

version accepted all of the changes that you had sent to me . . . ." The attachment was a services

agreement between Novartis and Essential Consultants. The agreement anticipates that Essential

Consultants will "provide consulting and advisory services to Novartis on matters that relate to the

repeal and replacement of the Affordable Care Act in the US and any other issues mutually

agreeable to [Essential Consultants] and Novartis." The contract also anticipates a "consulting fee

of One Million Two Hundred Thousand ($1,200,000) US dollars," to be paid to Essential

Consultants in even monthly installments over the course of a year.

63.     On or about February 18, 2017, Novartis Executive 1 emailed another executive at

Novartis:

> Confidentially I have put Michael Cohen on retainer to Novartis. He
> is the former personal attorney[18] to the President, and was influential
> in the selections of most of the administration. He will provide
> access and advice for us, but will not lobby. . . . I want to use him to
> set up meetings when I am in Washington in May . . . . Please think
> through who we should meet and let me know. I will contact Michael
> and ask him to set up meetings.

64.     On or about April 2, 2017, Novartis Executive 2 emailed Novartis Executive 1 and

stated that they wanted to assess COHEN's ability "to secure high-level government meetings"

within the Administration, and that there was "no need to divulge our relationship with [COHEN]."

65.     Non-content information obtained from the **Target Account** pursuant to an 18

U.S.C. § 2703(d) court order shows that COHEN has also communicated with Novartis employees

through the **Target Account**. Between approximately April 2017 and October 2017, COHEN has

sent approximately twenty emails from the **Target Account** to email addresses at Novartis's email

---

[18] At the time, COHEN still represented himself to be a personal attorney to the President. As of
November 2017, he continues to make such representations.

domain (novartis.com) and has received approximately fifteen emails from Novartis email addresses, including emails from Novartis Executive 1.

### G.    Michael D. Cohen & Associates P.C.

66.    In addition to monies received through Essential Consultants, banking records obtained through the course of the investigation show that during 2017 COHEN has received significant payments through another corporation with the name "Michael D. Cohen & Associates P.C." ("MDC&A"). Records from the New York State Department of State, Division of Corporations show that on or about March 21, 2017, COHEN registered the new corporation "Michael D. Cohen & Associates, P.C." Bank 1 records also show that in or around March 2017, COHEN opened a new bank account in the name of MDC&A. According to records obtained from Bank 1, COHEN is the sole signatory on the bank account.

67.    Records from Bank 1 that since approximately April 2017, approximately $291,666 has been made into the MDC&A account at Bank 1 from a bank account in the name of the law firm Squire Patton Boggs, as summarized below:

| DATE | AMOUNT |
|---|---|
| April 5, 2017 | $41,666.67 |
| April 28, 2017 | $41,666.67 |
| May 31, 2017 | $41,666.67 |
| June 30, 2017 | $41,666.67 |
| July 31, 2017 | $41,666.67 |
| August 31, 2017 | $41,666.67 |

Open-source records show that, on or about April 3, 2017, a press release from Squire Patton Boggs announced that the law firm and MDC&A have entered into a "strategic alliance" that "will enable

the two firms to work together to advance the interests of their clients." A search of open-source records has revealed no indication that this relationship has been terminated since April 2017.

68. Records obtained from another FDIC-insured financial institution ("Bank 6") show that in or around March 2017, a new account was opened in the name of COHEN's wife (COHEN is not identified as an account holder or signatory). Records from Bank 6 and another FDIC-insured financial institution ("Bank 7") show that since February 2017, COHEN has received over $280,000 through checks from President Trump, as summarized below:

| APPROXIMATE DATE OF CHECK | AMOUNT |
| --- | --- |
| February 14, 2017 | $70,000 |
| March 17, 2017 | $35,000 |
| May 23, 2017 | $35,000 |
| June 19, 2017 | $35,000 |
| June 19, 2017 | $35,000 |
| July 11, 2017 | $35,000 |
| August 1, 2017 | $35,000 |

In most cases, COHEN endorsed the check over to his wife, who deposited the check into the account the account opened at Bank 6 in her sole name.

69. Open-source records show that, on or about April 3, 2017, a press release from Squire Patton Boggs announced that the law firm and MDC&A have entered into a "strategic alliance" that "will enable the two firms to work together to advance the interests of their clients." A search of open-source records has revealed no indication that this relationship has been terminated since April 2017.

**H.    Recent Representations to Financial Institutions**

70.    According to Accountant 1, in or around early October 2017, COHEN directed Accountant 1 to prepare another "Statement of Financial Condition" for Bank 5.[19]  On or about October 6, 2017, Accountant 1 sent an email to COHEN at the Gmail Account.  In the email, Accountant 1 wrote that "[a]ttached is a draft of the new PFS as at September 30, 2017" and attached a draft of the personal financial statement.  According to this statement, COHEN claimed that as of September 30, 2017, he had assets of only $33,430,000 and liabilities of approximately $45,630,000, leaving him purportedly over $12 million in debt.

71.    In the October 6, 2017 email sent to COHEN at the Gmail Account, Accountant 1 warned COHEN that the financial statement did not list any assets associated with either Essential Consultants or MDC&A: "[w]e did not add any value for you[r] two operating entities – Michael D. Cohen & Associates POC [sic] and Essential Consultants LLC.  Please advise whether or not these should be disclosed and what value."  According to Accountant 1, in an earlier conversation COHEN had stated generally that he expected to earn approximately $5-6 million a year through Essential Consultants and an additional $70,000 per month through MDC&A; however, COHEN never provided Accountant 1 with any details.

72.    On or about October 6, 2017, COHEN, using the Gmail Account, responded to Accountant 1's email with the answer "[l]ooks good to me."  COHEN never provided Accountant 1 with any instructions to list any assets associated with Essential Consultants or MDC&A. Accountant 1 confirmed that neither entity was ever listed on the finalized Personal Financial

---

[19] Records obtained from Bank 5 indicate that COHEN continues to negotiate over his $21 million in medallion loans, which he and his wife have personally guaranteed.  Information obtained from Bank 5 indicates that COHEN has sought hundreds of thousands of debt relief from Bank 5 as part of negotiation.

Statement, and that COHEN has not made any estimated tax payments on behalf of Essential Consultants.

## BACKGROUND CONCERNING 1&1 EMAIL ACCOUNTS

73.     In my training and experience, I have learned that 1&1 provides a variety of on-line services, including electronic mail ("email") access, to the public.  1&1 allows subscribers to obtain email accounts at custom domains the customer purchases, like the **Target Account**. Subscribers obtain an account by registering for an email account with 1&1.  During the registration process, 1&1 asks subscribers to provide basic personal information.  Therefore, the computers of 1&1 are likely to contain stored electronic communications (including retrieved and unretrieved email for subscribers and information concerning subscribers and their use of services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

74.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

75.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

76.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

77.     This application seeks a warrant to search all responsive records and information under the control of 1&1, a provider subject to the jurisdiction of this court, regardless of where 1&1 has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any

records or other information pertaining to the customers or subscribers if such communication, record, or other information is within 1&1's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

78.    As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation.

For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## PRESERVATION OF THE TARGET ACCOUNT

79.     On or about October 19, 2017, the FBI sent a request, pursuant to 18 U.S.C. § 2703(f), to 1&1, requesting that 1&1 preserve all content associated with the **Target Account**.

## FILTER REVIEW PROCEDURES

80.     Review of the items described in Attachment A and Attachment B will be conducted pursuant to established procedures designed to collect evidence in a manner consistent with professional responsibility requirements concerning the maintenance of attorney-client and other operative privileges.  The procedures include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

## CONCLUSION

81.     Based on the forgoing, I request that the Court issue the proposed search warrant.

*[Remainder of the page left intentionally blank]*

## REQUEST FOR SEALING

82.     I further request that the Court order that all papers in support of this application, including the application, affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this _13th_ day of November, 2017.

_Beryl A. Howell_
The Honorable Beryl A. Howell
Chief United States District Judge

## ATTACHMENT A

This warrant applies to information associated with the email ▮▮▮▮▮▮▮▮**com** that is stored at premises owned, maintained, controlled, or operated by 1&1 Internet, Inc. ("1&1"), an electronic communication and/or remote computing service provider headquartered in Sunnyvale, California.

## ATTACHMENT B

### I.    Information to be disclosed by 1&1

To the extent that the information described in Attachment A is within the possession, custody, or control of the 1&1 (hereinafter "the Provider"), regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that have been deleted but are still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c. The types of service utilized;

d. All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, all other user names associated with the account, all account names associated with the subscriber, methods of connecting;

f.     All search history or web history;

g.     All records indicating the services available to subscribers of the accounts;

h.     All usernames associated with or sharing a login IP address or browser cookie with the accounts;

i.     All cookies, including third-party cookies, associated with the user;

j.     All records that are associated with the machine cookies associated with the user; and

k.     All telephone or instrument numbers associated with the Account (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1014 (false statements to a financial institution), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1956 (money laundering), as well as 18 U.S.C. § 951 (acting as an unregistered foreign agent) and the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, involving Michael Dean Cohen, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.     Communications, records, documents, and other files involving Essential Consultants, LLC;

b.     Communications, records, documents, and other files that false representations to a financial institution with relation to intended the purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

c.  Records of any funds or benefits received by or offered to Michael Dean Cohen by, or on behalf of, any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

d.  Communications, records, documents, and other files that reveal efforts by Michael Dean Cohen to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

e.  Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

f.  Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

g.  The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s); and

h.  The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with the account about any matters relating to activities conducted by Michael Dean Cohen on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals.

## III.    Review Protocols

Review of the items described in Attachment A and Attachment B shall be conducted pursuant to established procedures designed to collect evidence in a manner consistent with professional responsibility requirements concerning the maintenance of attorney-client and other operative privileges.  When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

INFORMATION ASSOCIATED WITH THE ACCOUNT
I████████████COM, WHICH IS STORED AT THE
PREMISES OF 1&1 INTERNET, INC.

)
)
)
)
)
)

Case: 1:17–mj–00854
Assigned To : Chief Judge Howell, Beryl A.
Assign. Date : 11/13/2017
Description:  Search and Seizure Warrant

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     November 20, 2017     *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____Hon. Beryl A. Howell_____.
                                                                      *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     11/13/2017 at 4:45PM                    *Beryl A. Howell*
                                                                 *Judge's signature*

City and state:     Washington, DC                        Hon. Beryl A. Howell, Chief U.S. District Judge
                                                               *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

This warrant applies to information associated with the email ███████████ com that is stored at premises owned, maintained, controlled, or operated by 1&1 Internet, Inc. ("1&1"), an electronic communication and/or remote computing service provider headquartered in Sunnyvale, California.

**ATTACHMENT B**

## I.  Information to be disclosed by 1&1

To the extent that the information described in Attachment A is within the possession, custody, or control of the 1&1 (hereinafter "the Provider"), regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that have been deleted but are still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.  The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.  The types of service utilized;

d.  All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.  All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, all other user names associated with the account, all account names associated with the subscriber, methods of connecting;

2

f.      All search history or web history;

g.      All records indicating the services available to subscribers of the accounts;

h.      All usernames associated with or sharing a login IP address or browser cookie with the accounts;

i.      All cookies, including third-party cookies, associated with the user;

j.      All records that are associated with the machine cookies associated with the user; and

k.      All telephone or instrument numbers associated with the Account (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

## II.      Information to be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1014 (false statements to a financial institution), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1956 (money laundering), as well as 18 U.S.C. § 951 (acting as an unregistered foreign agent) and the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq*., involving Michael Dean Cohen, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      Communications, records, documents, and other files involving Essential Consultants, LLC;

b.      Communications, records, documents, and other files that false representations to a financial institution with relation to intended the purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

3

c.      Records of any funds or benefits received by or offered to Michael Dean Cohen by, or on behalf of, any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

d.      Communications, records, documents, and other files that reveal efforts by Michael Dean Cohen to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

e.      Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

f.      Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

g.      The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s); and

h.      The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with the account about any matters relating to activities conducted by Michael Dean Cohen on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals.

## III.   Review Protocols

Review of the items described in Attachment A and Attachment B shall be conducted pursuant to established procedures designed to collect evidence in a manner consistent with professional responsibility requirements concerning the maintenance of attorney-client and other operative privileges.  When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
ACCOUNT ████████████COM,
WHICH IS STORED AT THE PREMISES OF
1&1 INTERNET, INC.

Case: 1:17-mj-00854
Assigned To : Chief Judge Howell, Beryl A.
Assign. Date : 11/13/2017
Description:  Search and Seizure Warrant

## MOTION TO SEAL WARRANT AND RELATED DOCUMENTS AND TO REQUIRE NON-DISCLOSURE UNDER 18 U.S.C. § 2705(b)

The United States of America, moving by and through its undersigned counsel, respectfully moves the Court for an Order placing the above-captioned warrant and the application and affidavit in support thereof (collectively herein the "Warrant") under seal, and precluding the provider from notifying any person of the Warrant pursuant to 18 U.S.C. § 2705(b). In regard to the non-disclosure, the proposed Order would direct 1&1 Internet, Inc. ("1&1"), an electronic communication and/or remote computing service provider headquartered in Sunnyvale, California, not to notify any other person (except attorneys for 1&1 for the purpose of receiving legal advice) of the existence or content of the Warrant for a period of one year unless otherwise ordered of the Court.

### JURISDICTION AND LEGAL BACKGROUND

1.    The Court has the inherent power to seal court filings when appropriate, including the Warrant. *United States v. Hubbard*, 650 F.2d 293, 315-16 (D.C. Cir. 1980) (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978)). The Court may also seal the Warrant to prevent serious jeopardy to an ongoing criminal investigation when, as in the present case, such jeopardy creates a compelling governmental interest in preserving the confidentiality of the Warrant. *See Washington Post v. Robinson*, 935 F.2d 282, 287-89 (D.C. Cir. 1991).

2.      In addition, this Court has jurisdiction to issue the requested order because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed fully below, acts or omissions in furtherance of the offense under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

3.      Further, the Court has authority to require non-disclosure of the Warrant under 18 U.S.C. § 2705(b). 1&1 provides an "electronic communications service," as defined in 18 U.S.C. § 2510(15), and/or "remote computing service," as defined in 18 U.S.C. § 2711(2). The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2712, governs how 1&1 may be compelled to supply communications and other records using a subpoena, court order, or search warrant. Specifically, Section 2703(c)(2) authorizes the Government to obtain certain basic "subscriber information" using a subpoena, Section 2703(d) allows the Government to obtain other "non-content" information using a court order, and Section 2703(a)-(b)(1)(A) allows the Government to obtain contents of communications using a search warrant. *See* 18 U.S.C. § 2703.

4.      The SCA does not set forth any obligation for providers to notify subscribers about subpoenas, court orders, or search warrants under Section 2703. However, many have voluntarily adopted policies of notifying subscribers about such legal requests. Accordingly, when necessary, Section 2705(b) of the SCA enables the Government to obtain a court order to preclude such notification. In relevant part, Section 2705(b) provides as follows:[1]

> (b) Preclusion of notice to subject of governmental access. — A governmental entity acting under section 2703 . . . may apply to a court for an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court

---

[1] Section 2705(b) contains additional requirements for legal process obtained pursuant to 18 U.S.C. § 2703(b)(1)(B), but the Government does not seek to use the proposed Order for any legal process under that provision.

deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order. The court shall enter such an order if it determines that there is reason to believe that notification of the existence of the warrant, subpoena, or court order will result in—

    (1) endangering the life or physical safety of an individual;

    (2) flight from prosecution;

    (3) destruction of or tampering with evidence;

    (4) intimidation of potential witnesses; or

    (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial.

18 U.S.C. § 2705(b). The United States District Court for the District of Columbia has made clear

that a nondisclosure order under Section 2705(b) must be issued once the Government makes the

requisite showing about potential consequences of notification:

> The explicit terms of section 2705(b) make clear that if a courts [sic] finds that there is reason to believe that notifying the customer or subscriber of the court order or subpoena may lead to one of the deleterious outcomes listed under § 2705(b), the court must enter an order commanding a service provider to delay notice to a customer for a period of time that the court determines is appropriate. Once the government makes the required showing under § 2705(b), the court is required to issue the non-disclosure order.

*In re Application for Order of Nondisclosure Pursuant to 18 U.S.C. § 2705(b) for Grand Jury*

*Subpoena #GJ2014031422765*, 41 F. Supp. 3d 1, 5 (D.D.C. 2014).

    5.    Accordingly, this motion to seal sets forth facts showing reasonable grounds to

command 1&1 not to notify any other person (except attorneys for 1&1 for the purpose of receiving

legal advice) of the existence of the Subpoena for a period of one year or until further order of the

Court.

<u>FACTS SUPPORTING SEALING AND NON-DISCLOSURE</u>

    6.    At the present time, law enforcement officers of the FBI are conducting an

investigation into violations related to 18 U.S.C. § 1014 (false statements to a financial institution),

18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), as well as 18 U.S.C. § 951

(acting as an unregistered foreign agent) and the Foreign Agents Registration Act ("FARA"), 22

3

U.S.C. § 611 et seq. arising out of the conduct of Michael D. Cohen. It does not appear that Cohen is currently aware of the nature and scope of the ongoing FBI investigation into him.

## REQUEST FOR SEALING AND NON-DISCLOSURE

7.      In this matter, the government requests that the Warrant be sealed until further order of the Court and that 1&1 and its employees be directed not to notify any other person of the existence or content of the Warrant (except attorneys for 1&1 for the purpose of receiving legal advice) for a period of one year or until further order of the Court.  Such an order is appropriate because the Warrant relates to an ongoing criminal investigation, the full scope of which is neither public nor known to the targets of the investigation, and its disclosure may alert these targets to the ongoing investigation and its scope.  Once alerted to this investigation, potential targets would be immediately prompted to destroy or conceal incriminating evidence, alter their operational tactics to avoid future detection, and otherwise take steps to undermine the investigation and avoid future prosecution.  In particular, given that they are known to use electronic communication and remote computing services, the potential target could quickly and easily destroy or encrypt digital evidence relating to their criminal activity.

8.      Given the complex and sensitive nature of the criminal activity under investigation, and also given that the criminal scheme may be ongoing, the Government anticipates that this confidential investigation will continue for the next year or longer.   However, should circumstances change such that court-ordered nondisclosure under Section 2705(b) becomes no longer needed, the Government will notify the Court and seek appropriate relief.

9.      There is, therefore, reason to believe that notification of the existence of the Warrant will seriously jeopardize the investigation, including by giving the targets an opportunity to flee from prosecution, destroy or tamper with evidence, and intimidate witnesses. *See* 18 U.S.C.

§ 2705(b)(2)-(5).   Because of such potential jeopardy to the investigation, there also exists a compelling governmental interest in confidentiality to justify the government's sealing request. *See Robinson*, 935 F.2d at 287-89.

10.   Based on prior dealings with 1&1 the United States is aware that, absent a court order under Section 2705(b) commanding 1&1 not to notify anyone about a legal request, it is 1&1's policy and practice, upon receipt of a warrant seeking the contents of electronically stored wire or electronic communications for a certain account, to notify the subscriber or customer of the existence of the warrant prior to producing the material sought.

WHEREFORE, for all the foregoing reasons, the government respectfully requests that the above-captioned warrant, the application and affidavit in support thereof, and all attachments thereto and other related materials be placed under seal, and furthermore, that the Court command 1&1 not to notify any other person of the existence or contents of the above-captioned warrant (except attorneys for 1&1 for the purpose of receiving legal advice) for a period of one year unless otherwise ordered by the Court.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated:  11/13/2017                      By:

**FILED**

NOV 1 3 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE ACCOUNT ▮▮▮▮▮▮▮▮▮ COM, WHICH IS STORED AT THE PREMISES OF 1&1 INTERNET, INC. | Case: 1:17-mj-00854 Assigned To : Chief Judge Howell, Beryl A. Assign. Date : 11/13/2017 Description:  Search and Seizure Warrant |
|---|---|

ORDER

The United States has filed a motion to seal the above-captioned warrant and related documents, including the application and affidavit in support thereof (collectively the "Warrant"), and to require 1&1 Internet, Inc. ("1&1"), an electronic communication and/or remote computing service provider headquartered in Sunnyvale, California, not to disclose the existence or contents of the Warrant pursuant to 18 U.S.C. § 2705(b).

The Court finds that the United States has established that a compelling governmental interest exists to justify the requested sealing, and that there is reason to believe that notification of the existence of the Warrant will seriously jeopardize the investigation, including by giving the targets an opportunity to flee from prosecution, destroy or tamper with evidence, and intimidate witnesses. *See* 18 U.S.C. § 2705(b)(2)-(5).

**IT IS THEREFORE ORDERED** that the motion is hereby **GRANTED**, and that the warrant, the application and affidavit in support thereof, all attachments thereto and other related materials, the instant motion to seal, and this Order be **SEALED** until further order of the Court; and

**IT IS FURTHER ORDERED** that, pursuant to 18 U.S.C. § 2705(b), 1&1 and its employees shall not disclose the existence or content of the Warrant to any other person (except attorneys for 1&1 for the purpose of receiving legal advice) for a period of one year unless otherwise ordered by the Court.

_____

THE HONORABLE BERYL A. HOWELL
CHIEF UNITED STATES DISTRICT JUDGE

10/13/2019
Date

U.S. District and Bankruptcy Courts
for the District of Columbia
A TRUE COPY
ANGELA D. CAESAR, Clerk

By_____
Deputy Clerk

2