AO 106 (Rev. 04/10)  Application for a Search Warrant

FILED

# UNITED STATES DISTRICT COURT

AUG – 1 2017

for the

District of Columbia

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched* <br> *or identify the person by name and address)* <br> INFORMATION ASSOCIATED WITH THE EMAIL <br> ACCOUNT MCOHEN@TRUMPORG.COM | ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case: 1:17-mj-00548
Assigned To : Howell, Beryl A.
Assign. Date : 8/1/2017
Description: Search and Seizure Warrant

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B. This warrant is sought pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 951; | Acting as a foreign agent without notice to the Attorney General; |
| 18 U.S.C. § 1014; | False Statements to a financial institution |
| 18 U.S.C. § 1344 | Bank Fraud |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____08/01/2017____

*Beryl A. Howell*

*Judge's signature*

City and state: Washington, D.C.

Hon. Beryl A. Howell, Chief U.S. District Judge

*Printed name and title*

FILED

AUG – 1 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
EMAIL ACCOUNT
MCOHEN@TRUMPORG.COM

Case: 1:17–mj–00548
Assigned To : Howell, Beryl A.
Assign. Date : 8/1/2017
Description: Search and Seizure Warrant

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A SEARCH WARRANT**

I, [redacted] being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information associated with the email address provided for the email account

mcohen@trumporg.com (hereinafter the **"Target Account"**), that is stored at premises owned,

maintained, controlled, or operated by Microsoft, an email provider headquartered at One

Microsoft Way, Redmond, WA 98052 (hereinafter "Microsoft"). The information to be searched

is described in the following paragraphs and in Attachment A. This affidavit is made in support

of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A) to require Microsoft to disclose to the government copies of the information

(including the content of communications) further described in Attachment A. Upon receipt of

the information described in Attachment A, government-authorized persons will review that

information to locate the items described in Attachment B.

2.      I am a Special Agent with Federal Bureau of Investigation ("FBI") assigned to FBI

Headquarters working directly with the Special Counsel's Office. I have been a Special Agent

with the FBI since 2012. Since then, I have conducted national security investigations of foreign

intelligence services, espionage, and counterproliferation matters. I have training and experience

1

related to foreign intelligence services national security investigations, as well as federal financial crimes. I have conducted and participated in various investigations involving multiple threat countries as well as national security threats and applicable criminal violations.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that MICHAEL DEAN COHEN has committed violations of 18 U.S.C. § 1014 (false statements to a financial institution), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 951 (acting as an unregistered foreign agent), and 22 U.S.C. § 611 *et seq*. (Foreign Agents Registration Act) (the "Subject Offenses"). There also is probable cause to search the information described in Attachment A for evidence, contraband, fruits, and/or instrumentalities of the Subject Offenses, further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *Id*. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      As described below, the FBI is investigating COHEN in connection with, *inter alia*, statements he made to a known financial institution (hereinafter "Bank 1") in the course of opening

a bank account held in the name of Essential Consultants, LLC and controlled by COHEN. The FBI also is investigating COHEN in connection with funds he received from entities controlled by foreign governments and/or foreign principals, and the activities in which he engaged in the United States on their behalf without properly disclosing such relationships to the United States government.

7.      On July 18, 2017, this Court, based in part on certain of the information set forth below, issued a warrant to search a separate email account with a different service provider, ███████@gmail.com (the "Gmail Account"), based on a finding of probable cause. Copies of the warrant to search the Gmail Account and accompanying affidavit are attached hereto as Attachment C and incorporated herein. As set forth in more detail below, there is probable cause to believe that COHEN used both the **Target Account** and the Gmail Account while committing the Subject Offenses.

### A.    Michael Cohen

8.      According to press reports and bank records collected during the investigation, COHEN served for over a decade as an executive in the Trump Organization, an international conglomerate with real estate and other holdings formerly controlled by President Donald Trump prior to his presidency. Until approximately January 2017, COHEN was reported to have held various positions within the Trump Organization. During an interview with *The Wall Street Journal* in or around January 2017, COHEN described his role as being "the fix-it guy . . . . Anything that [then-President-elect Trump] needs to be done, any issues that concern him, I handle."[1]

9.      In or around January 2017, COHEN made public statements that he would resign

---

[1] "Intelligence Dossier Puts Longtime Trump Fixer in Spotlight," *Wall Street Journal*, Jan. 11, 2017.

from the Trump Organization to serve as the personal attorney for President Trump (serving as an attorney to the President in his personal capacity, as opposed to as a member of the White House Counsel's Office). COHEN recently has identified himself publicly—including on his personal Twitter account—as a personal attorney for the President, and certain emails obtained pursuant to the warrant to search the Gmail Account identify Cohen as "Personal Attorney to President Donald J. Trump."

### B.   Essential Consultants, LLC

10.   In or around June 2017, federal agents reviewed information supplied by an FDIC-insured bank ("Bank 1") based on activity that Bank 1 had observed from a number of accounts related to COHEN. According to information provided by Bank 1, COHEN has been a customer since approximately June 2011 and controls several checking and loan accounts at Bank 1, some in his personal name and others in the names of corporate entities. Agents have subsequently reviewed documents and records provided by Bank 1 related to COHEN and these various accounts.

11.   Records provided by Bank 1 show that on or about October 26, 2016, COHEN opened a new checking account in the name of Essential Consultants, LLC ("Essential Consultants"); COHEN was the only authorized signatory on the account. On the paperwork associated with opening the account, COHEN listed the **Target Account** as his e-mail address for contact purposes. Corporate records show that Essential Consultants is a Delaware entity formed by COHEN on or about October 17, 2016.

12.   According to information provided by Bank 1, when COHEN opened the Essential Consultants account, he made the following representations during the course of Bank 1's know your customer ("KYC") procedures:

    a.  that he was opening Essential Consultants as a real estate consulting company to collect fees for investment consulting work;

    b.  that he intended to use his experience in real estate to consult on commercial and residential real estate deals;

    c.  that his typical clients were expected to be high net-worth domestic individuals; and

    d.  that his purpose in setting up the account was to keep the revenue from his consulting—which he said was not his main source of income—separate from his personal finances.

### C.   Payment to Person 1

13.    Records provided by Bank 1 show that, rather than using the Essential Consultants bank account for real estate consulting work as he had represented, COHEN immediately used the account upon opening to wire funds to an attorney ("Attorney 1"), on behalf of that attorney's client ("Person 1"), who according to press articles is an adult-film star who operates under a professional alias and who was contemplating making public allegations that she had an extra-marital affair with then-Presidential Candidate Trump.

14.    More specifically, on or about October 18, 2016, the day after COHEN incorporated Essential Consultants but approximately eight days before he opened the bank account in its name at Bank 1, the website *The Smoking Gun* published a story entitled "Donald Trump and the Porn Superstar," in which it alleged that evidence suggested Person 1 and Trump had previously engaged in an extramarital relationship.[2] The article also alleged that Person 1 had

---

[2] The Smoking Gun, "Donald Trump and the Porn Superstar," Oct. 18, 2016, *available at* http://www.thesmokinggun.com/documents/celebrity/donald-trump-and-stormy-daniels-738920.

at one point hired Attorney 1 as her representative.[3]  Later, on or about November 4, 2016, an article in *The Wall Street Journal* reported that Person 1, represented by Attorney 1, had been "in discussions with ABC's 'Good Morning America' in recent months to publicly disclose what she said was a past relationship with Mr. Trump, according to people familiar with the talks."[4]

15.     Telephone records show that two telephones registered to COHEN have been used to contact a telephone number associated with Attorney 1.  From in or around August 2016 through the present, approximately 42 telephone calls have occurred between the two telephones registered to COHEN and the telephone number associated with Attorney 1; of these, approximately 24 calls were exchanged between October 24, 2016 and November 4, 2016.

16.     On or about October 26, 2016, the same day as the Bank 1 account was opened in Essential Consultants' name, the account was funded via a $131,000 deposit from a different Bank 1 account related to a home equity line of credit ("HELOC") in COHEN's name and secured by his personal residence at 502 Park Avenue (Trump Tower Park Avenue) Ap██ New York, NY 10022.[5]  COHEN had opened the account in or around February 2016 and had secured a $500,000 line of credit for the stated purpose of paying off an existing mortgage and HELOC-associated loan costs.

17.     Emails obtained pursuant to this Court's warrant to search the Gmail Account further establish that the Essential Consultants account opened at Bank 1 was not used for the

---

[3] On or about June 26, 2017, a review of a cached version of Attorney 1's professional website revealed that Attorney 1 listed Person 1, referred to by Person 1's professional alias, as a "representative client."  (The current version of Attorney 1's website no longer seems to identify Person 1 by name or alias.)

[4] "National Enquirer Shielded Donald Trump from Playboy Model's Affair Allegation," *Wall Street Journal*, Nov. 4, 2016.

[5] A HELOC is a form of lending that allows a borrower to secure a loan using the equity in a residential property as collateral.

purposes represented by COHEN. For example:

   a. On or about October 26, 2016, COHEN, using the Gmail Account, received an
      email from Attorney 1 with the subject "Wiring Instructions." On or about October
      27, 2016—the day after COHEN opened and funded the Essential Consultants
      account with $131,000 from COHEN's HELOC account—an outgoing wire
      transfer in the amount of $130,000 was made from the Essential Consultants
      account at Bank 1 to an account held in the name of Attorney 1's law firm
      (hereinafter the "Attorney 1 IOLTA Account") at a bank based in Los Angeles
      ("Bank 2"). Records obtained from Bank 1 show that, on or about October 27,
      2016, an employee of Bank 1 sent an email to COHEN with the federal reference
      number for the $130,000 transfer of funds.

   b. On or about October 27, 2016, COHEN, again using the Gmail Account, emailed
      Attorney 1 with the subject "wire on behalf of Essential Consultants LLC." In the
      email, COHEN asked Attorney 1 to "confirm that the wire received today, October
      27, 2016 shall be held by you in your attorney's trust account until such time as
      directed for release by me, in writing. Additionally, please ensure that all
      paperwork contains the correct name of Essential Consultants LLC." On or about
      October 27, 2016, Attorney 1 replied, stating "that no funds shall be disbursed
      unless & until the plaintiff personally signs all necessary settlement paperwork, (the
      form of which will match the prior agreement). The settlement docs will name the
      correct corporation, (Essential Consultants LLC). Plaintiff's signature will be
      notarized and returned to you via FedEx."

   c. On or about November 1, 2016, Attorney 1 sent an email to COHEN via the Gmail

Account with the subject "Facts." In the email, Attorney 1 wrote, "Give this a lesson [sic] and then call me" and attached an audio recording between Person 1 and Attorney 1. On the recording, Person 1 made statements in which she discredited allegations made by another woman that President Trump had engaged in sexual misconduct.

18.     Based on the account activity (and the fact that it did not match what COHEN had reported the expected activity would be), Bank 1 made a request, pursuant to Section 314(b) of the USA PATRIOT Act, to Bank 2 in order to determine the ultimate disposition of the $130,000 in funds. According to Bank 1, Bank 2 indicated that on or about November 1, 2016, a wire transfer in the amount of approximately $96,645 was made from the Attorney 1 IOLTA Account to a bank account at a third bank ("Bank 3") in the name of Person 1. A notation associated with the wire transfer to Person 1 indicated that the purpose of the payment was "net settlement." The remaining $34,355 was transferred from the Attorney 1 IOLTA Account to the operating account of Attorney 1's law firm at Bank 2.

19.     By on or about November 4, 2016, *The Wall Street Journal* reported that Person 1 had cut off contact with "Good Morning America," notwithstanding previous discussions to disclose her claimed relationship with Trump. The investigation has not identified any public statements made by Person 1 about any relationship to President Trump since the above-described transfer of funds to her account in or around November 2016.

## D.     Representations to Bank 1 about Net Worth to Financial Institutions

20.     In connection with the ongoing investigation, the government has reviewed other representations COHEN has made to Bank 1 and other financial institutions, including representations regarding his net worth and financial health made during the course of loan

applications. A review to date has identified substantial inconsistencies in COHEN's stated assets, liabilities, and net worth in separate loan applications submitted between 2013 and 2017.

21.     For example, in or around July 2013, COHEN submitted a "Statement of Financial Condition" as of July 1, 2013 to Bank 1. The document purported to lay out COHEN's various assets and liabilities, as well as his net worth. On the document, COHEN claimed to have assets totaling approximately $87,190,000 and liabilities of approximately $9,550,000. On the same document, COHEN claimed to have a net worth of approximately $70,600,000.

22.     In or around October 2014, COHEN submitted a "Statement of Financial Condition" as of August 1, 2014 to Bank 1. The document purported to lay out COHEN's various assets and liabilities, as well as his net worth. On the document, COHEN claimed to have assets totaling approximately $99,420,000 and liabilities of approximately $23,550,000. On the same document, COHEN claimed to have a net worth of approximately $75,870,000.

23.     In or around February 2016, in connection with opening the $500,000 HELOC described above, COHEN submitted a summary of his assets, liabilities, and net worth to Bank 1. COHEN claimed to have assets totaling approximately $63,435,315 and liabilities of approximately $10,419,209. On the same document, COHEN claimed to have a net worth of approximately $53,016,106.

24.     On or about June 8, 2017, COHEN sent an email from his Gmail account to an employee of a different FDIC-insured financial institution ("Bank 5") a "Statement of Financial Condition" as of May 1, 2017.[6] On the document, COHEN claimed to have assets totaling

---

[6] Bank records show that COHEN has a lending relationship with a known FDIC-insured financial institution ("Bank 5") that uses New York taxi medallions as collateral. According to the same statement, closely held entities controlled by COHEN had approximately $20,000,000 in notes payable to Bank 5; the debt was secured by medallions with a total market value of only $13,950,000.

approximately $41,955,000 and liabilities of approximately $39,130,000.  On the same document, COHEN claimed to have a net worth of approximately $2,825,000.

**E.    Foreign Transactions in the Essential Consultants Account with a Russian Nexus**

25.    As set forth above, in or around October 2016, COHEN made several representations to Bank 1 in connection with the bank's KYC review process, including that he expected funds deposited into the Essential Consultants account would constitute income from his consulting work, that his consulting clients were expected to be domestic (that is, within the United States), and that he expected his clients to be U.S.-based, high-net worth individuals.

26.    Records obtained from Bank 1 show substantial transactional activity that appears to be inconsistent with these KYC representations.  Bank 1 records show that the account received numerous deposits from foreign businesses and entities that do not reflect the stated client profile for the residential and commercial real-estate consulting services ostensibly being provided by Essential Consultants.  Moreover, public records, media reports, and other publicly available sources, as well as emails obtained pursuant to the warrant to search the Gmail Account, indicate that some of these companies have significant ties to foreign governments or are entities controlled by foreign governments.

27.    A search in or around July 2017 of the U.S. Department of Justice database of all agents currently or previously registered under the Foreign Agent Registration Act ("FARA") confirmed that neither COHEN nor Essential Consultants is or has been a registered agent of a foreign government.[7]    All FARA registration is handled by the U.S. Department of Justice's National Security Division in Washington, D.C.

---

[7] The database is publicly available at https://www.fara.gov/.

i.     Deposits by Columbus Nova, LLC

28.     Telephone records related to COHEN's cellular telephone show that on or about November 8, 2016, the day of the presidential election, a telephone registered to COHEN exchanged the first in a series of text messages with the CEO of Columbus Nova, LLC ("Columbus Nova"). Between approximately November 8, 2016 and July 14, 2017, telephone records show over 230 telephone calls and 950 text messages were exchanged between COHEN's cellular telephone and the CEO of Columbus Nova. Telephone records show no such text messages or telephone calls between COHEN's cellular telephone and the CEO of Columbus Nova prior to November 8, 2016.

29.     Public records show that Columbus Nova, LLC is an investment management firm controlled by Renova Group ("Renova"), an industrial holding company based in Zurich, Switzerland. According to public news accounts, Renova is controlled by Viktor Vekselberg, a wealthy Russian national. Public news accounts also report that Vekselberg is an oligarch with various connections to Russian President Vladimir Putin who publicly met with Putin as recently as in or around March 2017.[8] According to the news articles, Vekselberg and Renova currently are involved in various infrastructure projects in Russia, such as the building of an airport in Rostov in advance of the 2018 FIFA World Cup, which is to be held in Russia. Vekselberg has been involved in various symbolic acts seen to be in the Russian national interest, such as the purchase and repatriation of historic Faberge eggs.[9]

---

[8] *See, e.g.*, "Russia's Putin Meets Tycoon Vekselberg," *Reuters*, Mar. 14, 2017.

[9] On or about September 5, 2016, media outlets reported that Russian authorities arrested two of Vekselberg's closest associates in connection with allegations that a subsidiary had paid over $12 million in bribes to Russian government officials. Some media accounts speculated that the arrest of Vekselberg's associates, as well as the commensurate searches of Renova's head office, were intended as a warning from the Russian government that it wanted some form of cooperation or

30.     On or about February 10, 2017, Cohen, through his Google email account, received an email from an employee of Columbus Nova, informing him that his name had been added to Columbus Nova's security list at its office building. The Columbus Nova employee also told Cohen that his office would be would be available shortly.

31.     According to records obtained from Bank 1 through June 30, 2017, in the first six months of 2017, the Essential Consultants bank account received six deposits, each in the amount of $83,333 (for a running total of $499,998). The funds for all six deposits—five of which were wire transfers and one by check—came from an account at another bank held in the name of Columbus Nova, LLC.

32.     Records obtained from the financial institution ("Bank 4") where the Columbus Nova account is located show that the funds used to pay COHEN originated from a second account in the name of Renova US Management LLC ("Renova US"). For example, on or about January 27, 2017, the Columbus Nova account at Bank 4 received a deposit of $83,333 from an account held in the name of Renova US. The same day, a check for $83,333 and drawn on the Columbus Nova account at Bank 4 was made out to Essential Consultants LLC. On or about March 2, 2017, the Columbus Nova account at Bank 4 received $83,333 from the Renova US account. The same day, the Columbus Nova account was used to $83,333 the Essential Consultants account at Bank 1. On or about March 31, 2017, the Columbus Nova account at Bank 4 received $83,333 from the Renova US account. The same day, the Columbus Nova account was used to wire $83,333 to the Essential Consultants account at Bank 1. The government continues to investigate why the funds used to pay COHEN have been wired through this Columbus Nova account as opposed to coming

---

value from Vekselberg. *See, e.g.*, "Another Billionaire Incurs Putin's Wrath," *Bloomberg*, Sept. 6, 2016.

directly from the Renova US account.

ii.    <u>Plan to Lift Russian Sanctions</u>

33.    On or about February 19, 2017, *The New York Times* published an article reporting that COHEN had been involved in distributing a proposed plan to the then-National Security Adviser, Michael T. Flynn, for the United States to lift sanctions on Russia as part of a negotiated end to the hostilities in Ukraine. The terms of the proposal appear to have been favorable to the Russians, according to *The New York Times* article.[10]

34.    According to the article, prior to meeting with Flynn, COHEN had been approached by a Ukrainian politician ("Person 2") and a Russian-American businessman ("Person 3") who had prior business dealings with COHEN and the Trump Organization. The news report stated that Person 3 had previously been responsible for scouting deals in Russia for the Trump Organization through his company; that COHEN met personally with both Person 2 and Person 3 about the proposal; and that during the meeting with Person 3, COHEN received the written plan in a sealed envelope.

35.    The news report further stated that COHEN confirmed that he met with Person 2 and Person 3 and received the plan in a sealed envelope, and that in or around February 2017, COHEN then traveled to the White House, met the President in the Oval Office, and left the proposal in the office occupied by then-National Security Adviser Flynn. According to the news report, COHEN stated that he was waiting for a response at the time that Flynn was forced from his post as the National Security Adviser.

36.    Telephone records reviewed during the investigation show that, between January

---

[10] "A Back-Channel Plan for Ukraine and Russia, Courtesy of Trump Associates," *New York Times*, Feb. 19, 2017.

5, 2017 and February 20, 2017, a cellular telephone registered to COHEN and a telephone registered to Person 3 exchanged approximately twenty calls. Similarly, on or about January 11, 2017, a call was exchanged between a cellular telephone registered to COHEN and a telephone registered to Flynn.

37.    The United States continues to investigate if any of the payments or financial relationships described above, or other relationships described further below, were connected to COHEN's involvement in the distribution of a plan to lift Russian sanctions.

### F.    Other Foreign Transactions in the Essential Consultants Account

#### i.    Deposits by Korea Aerospace Industries Ltd.

38.    According to Bank 1, on or about May 10, 2017 and June 9, 2017, the Essential Consultants bank account received two deposits in the amount $150,000 (totaling $300,000 between the two deposits) from a bank account in Seoul, South Korea. According to documents obtained from Bank 1, the account holder from which the money was sent is Korea Aerospace Industries Ltd. ("KAI"). According to its public website, KAI is a South Korea-based company that produces and sells fixed-wing aircraft, helicopter aircraft, and satellites. Public news accounts report that KAI has partnered with Lockheed Martin to bid later this year on a $16 billion U.S. Air Force T-X Trainer Jet Replacement Program.

39.    On or about April 28, 2017, COHEN, using the Gmail account, sent an email to another individual with the subject "K Project." In the email, COHEN attached a document purporting to be a "Consulting Agreement" between KAI and Essential Consultants LLC that was to enter into effect on May 1, 2017. The document indicates that Essential Consultants would render "consulting and advisory services, as requested" by KAI; no further information was provided regarding the nature of the consulting and advisory services to be provided. The

document also indicated that KAI would pay Essential Consultants "a consulting fee of One Million Two Hundred Thousand ($1,200,000.00) US Dollars," disbursed through eight $150,000 installments between May 2017 and December 2017.

40.      According to publicly available materials and press accounts, as well as the company's financial disclosures, the Republic of Korea (South Korea) government has significant ties to KAI. KAI itself was formed in 1999 as part of a government-led effort to consolidate South Korea's aerospace industry manufacturers into a new single entity. KAI holds the exclusive rights for all of the government's military logistics and aerospace projects.[11]   The South Korean government, through the Korea Development Bank, is the largest shareholder in KAI and its largest debt holder.[12]   According to information provided by Bank 1, messages related to the transfer of funds from KAI indicated that the purpose of these payments was "consulting services."

ii.      Wire Transfers from a Kazakhstani Bank

41.      On or about May 10, 2017, COHEN, using his Gmail account, sent an email to an unknown individual containing an attachment with the filename "BTA-1."   The attachment contained a purported invoice for $150,000 from Essential Consultants LLC to BTA Bank in the Republic of Kazakhstan. The invoice, identified by invoice BTA-101 referred to a "monthly consulting fee" pursuant to a "Services Agreement entered into on the 8th of May, 2017."   The invoice was directed to the attention of Kenges Rakishev. Open-source records identify Rakishev as the majority shareholder of Kazkommertsbank, another Kazakhstani bank that controls BTA bank. Rakishev is also the son-in-law of Kazakhstan's ambassador to Russia.

---

[11] *See, e.g.*, Andrew Tylecote & Francesca Visintin, *Corporate Governance, Finance and the Technological Advantage of Nations* (2008), at 165–66; International Business Publications, *Korea South: A "Spy" Guide* (2016), at 229–31.

[12] KAI, Annual Report 2014, *available at* https://www.koreaaero.com/upload_images/new_pdf/annual/PDF/Annual_report_eng_2014.pdf.

42.     According to Bank 1, on or about May 22, 2017, the Essential Consultants bank account at Bank 1 received a $150,000 deposit from an account at Kazkommertsbank. According to Bank 1, the listed account holder at Kazkommertsbank was a second Kazakhstani bank named BTA Bank, AO.  Bank 1 reported that a message accompanying the wire payment indicated that the agreement was a "monthly consulting fee as per Inv BTA-101 DD May 10, 2017 consulting agreement W/N DD 08 05 2017 CNTR W/NDD 08/05/2017."[13]

### iii.     Wire Transfers from Novartis Investments, SARL

43.     Bank 1 also reported that on or about April 15, 2017 and May 15, 2017, the Essential Consultants account at Bank 1 received two deposits in the amount of $99,800 (totaling $199,600) from a Swiss bank account held in the name of Novartis Investments, SARL.  Novartis Investments, SARL is the in-house financial subsidiary of the Swiss pharmaceutical company Novartis AG.

### G.     Bo and Abe Realty, LLC

44.     As described above, the initial $131,000 in funds transferred into the Essential Consultants, LLC account on or about on or about October 26, 2016—and the funds subsequently wired to the Attorney 1 IOLTA Account the following day—originated from a different Bank 1 account in COHEN's name.  Specifically, the $131,000 was drawn from a $500,000 HELOC in

---

[13] According to press reports, BTA Bank has been mired in a multi-billion dollar fraud that implicates its former top executives.  According to a *Forbes* article published in or around February 2017, for example, BTA Bank's auditors PricewaterhouseCoopers previously identified a $10 billion discrepancy on the bank's balance sheets.  Subsequent investigation by forensic accountants revealed that a unit of BTA had been used to issue billions of dollars' worth of credit for property development and other deals in Russia, Ukraine, and Belarus.  The investigation also indicated that funds illicitly had been removed from the bank through shell companies set up in the names of executives' family members. *See* "How To Get Back A Lost $10B: One Bank's Tale in Europe's Biggest Alleged Fraud," *Forbes*, Feb. 6, 2017.

COHEN's name and secured by his personal residence.[14]

45.    Bank records produced by Bank 1 show that, subsequent to the transfer of $131,000 out of the HELOC (and ultimately to Attorney 1 and Person 1), COHEN repaid the line of credit through another series of financial transactions. Records show that the ultimate source of funds used to repay the HELOC funds came from a different company associated with COHEN, operating under the name Bo and Abe Realty, LLC ("Bo and Abe Realty").

46.    According to records of incorporation obtained from the New York Department of State, Division of Corporations, Bo and Abe Realty LLC was incorporated on or about July 29, 2013. Documents show that the organizer was Michael Cohen and the associated business address was COHEN's residential address at 502 Park Avenue, ▮▮▮▮ New York, NY 10022. No other agents or addresses were listed on the incorporating paperwork.

47.    Bank 1 records show that on or about July 31, 2013, COHEN signed account opening documentation in order to open a bank account in the name of Bo and Abe Realty. In the documentation, COHEN identified himself as the President of Bo and Abe Realty; the opening documentation described the purpose of the business as the "purchase of real estate." The account opening documentation also listed two other signatories on the account: COHEN's brother ("Person 4"), and Person 4's mother-in-law ("Person 5"). Both Person 4 and Person 5 were identified as "members" of the company.[15]

---

[14] Prior to October 2016, COHEN appears to have used approximately half of the $500,000 line of credit to pay off a preexisting HELOC at another financial institution.

[15] A sizeable portion of the funds deposited into the Bo and Abe Realty account came from an account in Person 5's name. A review of documents provided by Bank 1 as well as information provided by other financial institutions indicate that both Person 4 and Person 5 are involved in and receive significant funds through a different entity operating under the name Ukrethanol, LLC ("Ukrethanol"). Ukrethanol has been involved in a series of suspicious transactions and has been suspected of possible money laundering or structuring. For example, in or around June 2013, Bank

## USE AND LOCATION OF THE TARGET ACCOUNT

48.     Records obtained in the investigation show that COHEN used both the **Target Account** and the Gmail Account during the course of his interactions with Bank 1 described above.

49.     For example, on or about December 4, 2015, COHEN submitted an application to Bank 1 for a HELOC in the amount of $500,000. COHEN provided the **Target Account** as his email address, as well as the contact email address for his wife.

50.     In addition, as described above, on or about October 26, 2016, COHEN completed paperwork to open an account at Bank 1 in the name of Essential Consultants. As part of the account opening processes, COHEN provided Bank 1 with a signed Addendum to Business Master Signature Card Resolution and Agreement to Open Accounts and Services pertaining to Essential Consultants. On the addendum, COHEN provided a copy of his signature to Bank 1, as well as contact information for Bank 1. On the addendum, COHEN listed the **Target Account** as his e-mail address for contact purposes.

51.     On or about December 13, 2016, COHEN sent an e-mail from the **Target Account** to an employee at Bank 1, requesting assistance in completing wiring instructions for the Essential Consultants account.

52.     On or about March 21, 2017, COHEN used the Gmail Account to respond to an email from an employee at Bank 1 with updated contact information. In his response, COHEN copied the **Target Account**. On or about March 23, 2017, COHEN submitted paperwork to Bank 1 for the purpose of opening a new account; in the section for customers to provide contact

---

3 closed a business account held in the name of Ukrethanol and exited its relationship with the company as a result of suspicious activity in the business account. The government continues to investigate the source of the Ukrethanol funds and the ultimate disposition of these monies.

information, COHEN, by hand, struck out the **Target Account** address and in its place wrote the Gmail Account as his then-current e-mail address.

53.     In addition, based on a preliminary review of emails obtained pursuant to the search warrant for the Gmail Account, evidence strongly suggests that COHEN used at least one other means of electronic communication besides the Gmail Account in the course of the activity described above.   For example, while COHEN and the CEO of Columbus Nova began communicating by telephone and text on or about November 8, 2016, the first email between a Columbus Nova employee and COHEN via Gmail does not appear to have occurred until February 2017, after the first payment of $83,333 was deposited into the account of Essential Consultants LLC.

54.     On or about July 14, 2017, the Federal Bureau of Investigation sent a request, pursuant to 18 U.S.C. § 2703(f), to Microsoft, requesting that Microsoft preserve all content for all email accounts associated with the domain "trumporg.com," which included the **Target Account**.

55.     On or about July 20, 2017 and again on or about July 25, 2017, in response to a grand jury subpoena, Microsoft confirmed that the **Target Account** was an active account associated with the domain trumporg.com.  Microsoft also provided records indicating that email accounts associated with the domain "trumporg.com" are being operated on a Microsoft Exchange server.  According to publicly available information on Microsoft's website, Microsoft hosts emails for clients on Microsoft Exchange servers, while allowing customers to use their own domain (as opposed to the publicly available email domains supplied by Microsoft, such as hotmail.com).  According to information supplied by Microsoft, the domain trumporg.com

continues to operate approximately 150 active email accounts through Microsoft Exchange, meaning that data associated with trumporg.com still exists on Microsoft's servers.

## BACKGROUND CONCERNING MICROSOFT-SUPPORTED EMAIL

56.     In my training and experience, I have learned that Microsoft provides a variety of on-line services, including electronic mail ("email") access.  Subscribers obtain an account by registering a specific email address that serves as their unique account identifier.  During the registration process, Microsoft asks for basic personal information, such as a name that should be associated with the account.  Therefore, the computers of Microsoft are likely to contain stored electronic communications, including retrieved and unretrieved email and information concerning subscribers and their use of services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

57.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

58.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

59.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

60.     This application seeks a warrant to search all responsive records and information under the control of Microsoft, a provider subject to the jurisdiction of this court, regardless of where Microsoft has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications

and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Microsoft's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States. [16]

61.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime

---

[16] It is possible that Microsoft stores some portion of the information sought outside of the United States. In *Microsoft Corp. v. United States*, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information—including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Microsoft. The government also seeks the disclosure of the physical location or locations where the information is stored.

under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## PRESERVATION OF THE TARGET ACCOUNT

62.     On or about June 21, 2017, the Federal Bureau of Investigation sent a request, pursuant to 18 U.S.C. § 2703(f), to Microsoft, requesting that Microsoft preserve all content associated with the **Target Account**.

## FILTER REVIEW PROCEDURES

63.     Review of the items described in Attachment A and Attachment B will be conducted pursuant to established procedures designed to collect evidence in a manner consistent with professional responsibility requirements concerning the maintenance of attorney-client and other operative privileges. The procedures include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

## CONCLUSION

64.     Based on the forgoing, I request that the Court issue the proposed search warrant.

## REQUEST FOR SEALING

65.     I further request that the Court order that all papers in support of this application, including the application, affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this _1 st_ day of August, 2017.

The Honorable Beryl A. Howell
Chief United States District Judge

## ATTACHMENT A

This warrant applies to information associated with the email account mcohen@trumporg.com that is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, an email provider headquartered at One Microsoft Way, Redmond, WA 98052.

## ATTACHMENT B

I.      **Information to be disclosed by Microsoft Corporation**

To the extent that the information described in Attachment A is within the possession, custody, or control of Microsoft Corporation (hereinafter "the Provider"), regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that have been deleted but are still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided

during registration, all other user names associated with the account, all account names associated with the subscriber, methods of connecting;

f.     All search history or web history;

g.     All records indicating the services available to subscribers of the accounts;

h.     All usernames associated with or sharing a login IP address or browser cookie with the accounts;

i.     All cookies, including third-party cookies, associated with the user;

j.     All records that are associated with the machine cookies associated with the user; and

k.     All telephone or instrument numbers associated with the Account (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1014 (false statements to a financial institution), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 951 (acting as an unregistered foreign agent), and 22 U.S.C. § 611 *et seq.* (Foreign Agents Registration Act), involving Michael Dean Cohen and occurring on or after January 1, 2016, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.     Communications, records, documents, and other files involving Essential Consultants, LLC;

b.     Communications, records, documents, and other files involving Bo and Abe Realty, LLC;

c.     Communications, records, documents, and other files that false representations to a financial institution with relation to intended the purpose of an account or loan at that financial institution; the nature of any business or entity associated with an

account a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

d.   Records of any funds or benefits received by or offered to Michael Dean Cohen by, or on behalf of, any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

e.   Communications, records, documents, and other files that reveal efforts by Michael Dean Cohen to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

f.   Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

g.   Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

h.   The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s); and

i.   The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with the account about any matters relating to activities conducted by Michael Dean Cohen on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals.

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**INFORMATION ASSOCIATED WITH THE EMAIL<br>ACCOUNT MCOHEN@TRUMPORG.COM** | )<br>)<br>)<br>)<br>)<br>) | Case: 1:17–mj–00548<br>Assigned To : Howell, Beryl A.<br>Assign. Date : 8/1/2017<br>Description: Search and Seizure Warrant |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Western _____ District of _____ Washington _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 15, 2017 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Beryl A. Howell _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   *August 1, 2017 2:30 PM*          *Beryl A. Howell*
                                                                                         *Judge's signature*

City and state:    Washington, DC                          Hon. Beryl A. Howell, Chief U.S. District Judge
                                                                                *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

This warrant applies to information associated with the email account mcohen@trumporg.com that is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, an email provider headquartered at One Microsoft Way, Redmond, WA 98052.

## ATTACHMENT B

**I.     Information to be disclosed by Microsoft Corporation**

To the extent that the information described in Attachment A is within the possession, custody, or control of Microsoft Corporation (hereinafter "the Provider"), regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that have been deleted but are still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.   The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.   The types of service utilized;

d.   All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.   All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided

during registration, all other user names associated with the account, all account names associated with the subscriber, methods of connecting;

f.    All search history or web history;

g.    All records indicating the services available to subscribers of the accounts;

h.    All usernames associated with or sharing a login IP address or browser cookie with the accounts;

i.    All cookies, including third-party cookies, associated with the user;

j.    All records that are associated with the machine cookies associated with the user; and

k.    All telephone or instrument numbers associated with the Account (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1014 (false statements to a financial institution), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 951 (acting as an unregistered foreign agent), and 22 U.S.C. § 611 *et seq.* (Foreign Agents Registration Act), involving Michael Dean Cohen and occurring on or after January 1, 2016, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.    Communications, records, documents, and other files involving Essential Consultants, LLC;

b.    Communications, records, documents, and other files involving Bo and Abe Realty, LLC;

c.    Communications, records, documents, and other files that false representations to a financial institution with relation to intended the purpose of an account or loan at that financial institution; the nature of any business or entity associated with an

account a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

d.    Records of any funds or benefits received by or offered to Michael Dean Cohen by, or on behalf of, any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

e.    Communications, records, documents, and other files that reveal efforts by Michael Dean Cohen to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

f.    Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

g.    Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

h.    The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s); and

i.    The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with the account about any matters relating to activities conducted by Michael Dean Cohen on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE EMAIL ACCOUNT MCOHEN@TRUMPORG.COM | Case: 1:17-mj-00548<br>Assigned To : Howell, Beryl A.<br>Assign. Date : 8/1/2017<br>Description: Search and Seizure Warrant |

MOTION TO SEAL WARRANT AND RELATED DOCUMENTS AND
TO REQUIRE NON-DISCLOSURE UNDER 18 U.S.C. § 2705(b)

The United States of America, moving by and through its undersigned counsel, respectfully moves the Court for an Order placing the above-captioned warrant and the application and affidavit in support thereof (collectively herein the "Warrant") under seal, and precluding the provider from notifying any person of the Warrant pursuant to 18 U.S.C. § 2705(b). In regard to the non-disclosure, the proposed Order would direct Microsoft Corporation ("Microsoft"), an electronic communication and/or remote computing services provider headquartered at One Microsoft Way, Redmond, WA 98052, not to notify any other person (except attorneys for Microsoft for the purpose of receiving legal advice) of the existence or content of the Warrant for a period of one year or until further order of the Court.

JURISDICTION AND LEGAL BACKGROUND

1.      The Court has the inherent power to seal court filings when appropriate, including the Warrant. *United States v. Hubbard*, 650 F.2d 293, 315-16 (D.C. Cir. 1980) (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978)). The Court may also seal the Warrant to prevent serious jeopardy to an ongoing criminal investigation when, as in the present case, such jeopardy creates a compelling governmental interest in preserving the confidentiality of the Warrant. *See Washington Post v. Robinson*, 935 F.2d 282, 287-89 (D.C. Cir. 1991).

2.      In addition, this Court has jurisdiction to issue the requested order because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed fully below, acts or omissions in furtherance of the offense under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

3.      Further, the Court has authority to require non-disclosure of the Warrant under 18 U.S.C. § 2705(b). Microsoft provides an "electronic communications service," as defined in 18 U.S.C. § 2510(15), and/or "remote computing service," as defined in 18 U.S.C. § 2711(2). The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2712, governs how Microsoft may be compelled to supply communications and other records using a subpoena, court order, or search warrant. Specifically, Section 2703(c)(2) authorizes the Government to obtain certain basic "subscriber information" using a subpoena, Section 2703(d) allows the Government to obtain other "non-content" information using a court order, and Section 2703(a)-(b)(1)(A) allows the Government to obtain contents of communications using a search warrant. *See* 18 U.S.C. § 2703.

4.      The SCA does not set forth any obligation for providers to notify subscribers about subpoenas, court orders, or search warrants under Section 2703. However, many have voluntarily adopted policies of notifying subscribers about such legal requests. Accordingly, when necessary, Section 2705(b) of the SCA enables the Government to obtain a court order to preclude such notification. In relevant part, Section 2705(b) provides as follows:[1]

> (b) Preclusion of notice to subject of governmental access. — A governmental entity acting under section 2703 . . . may apply to a court for an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court

---

[1] Section 2705(b) contains additional requirements for legal process obtained pursuant to 18 U.S.C. § 2703(b)(1)(B), but the Government does not seek to use the proposed Order for any legal process under that provision.

deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order.  The court shall enter such an order if it determines that there is reason to believe that notification of the existence of the warrant, subpoena, or court order will result in—

    (1) endangering the life or physical safety of an individual;

    (2) flight from prosecution;

    (3) destruction of or tampering with evidence;

    (4) intimidation of potential witnesses; or

    (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial.

18 U.S.C. § 2705(b).  The United States District Court for the District of Columbia has made clear that a nondisclosure order under Section 2705(b) must be issued once the Government makes the requisite showing about potential consequences of notification:

> The explicit terms of section 2705(b) make clear that if a courts [*sic*] finds that there is reason to believe that notifying the customer or subscriber of the court order or subpoena may lead to one of the deleterious outcomes listed under § 2705(b), the court must enter an order commanding a service provider to delay notice to a customer for a period of time that the court determines is appropriate. Once the government makes the required showing under § 2705(b), the court is required to issue the non-disclosure order.

*In re Application for Order of Nondisclosure Pursuant to 18 U.S.C. § 2705(b) for Grand Jury Subpoena #GJ2014031422765*, 41 F. Supp. 3d 1, 5 (D.D.C. 2014).

    5.    Accordingly, this motion to seal sets forth facts showing reasonable grounds to command Microsoft not to notify any other person (except attorneys for Microsoft for the purpose of receiving legal advice) of the existence of the Subpoena for a period of one year or until further order of the Court.

<u>FACTS SUPPORTING SEALING AND NON-DISCLOSURE</u>

    6.    At the present time, law enforcement officers of the FBI are conducting an investigation into violations related to 18 U.S.C. § 1014 (false statements to a financial institution), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 951 (acting as an unregistered foreign agent), and 22 U.S.C. § 611 *et seq.* (Foreign Agents Registration Act)

arising out of the conduct of Michael D. Cohen. It does not appear that Cohen is currently aware of the nature and scope of the ongoing FBI investigation into him.

REQUEST FOR SEALING AND NON-DISCLOSURE

7.     In this matter, the government requests that the Warrant be sealed until further order of the Court and that Microsoft and its employees be directed not to notify any other person of the existence or content of the Warrant (except attorneys for Microsoft for the purpose of receiving legal advice) for a period of one year or until further order of the Court.  Such an order is appropriate because the Warrant relates to an ongoing criminal investigation, the full scope of which is neither public nor known to the targets of the investigation, and its disclosure may alert these targets to the ongoing investigation and its scope.  Once alerted to this investigation, potential targets would be immediately prompted to destroy or conceal incriminating evidence, alter their operational tactics to avoid future detection, and otherwise take steps to undermine the investigation and avoid future prosecution.  In particular, given that they are known to use electronic communication and remote computing services, the potential target could quickly and easily destroy or encrypt digital evidence relating to their criminal activity.

8.     Given the complex and sensitive nature of the criminal activity under investigation, and also given that the criminal scheme may be ongoing, the Government anticipates that this confidential investigation will continue for the next year or longer.   However, should circumstances change such that court-ordered nondisclosure under Section 2705(b) becomes no longer needed, the Government will notify the Court and seek appropriate relief.

9.     There is, therefore, reason to believe that notification of the existence of the Warrant will seriously jeopardize the investigation, including by giving the targets an opportunity to flee from prosecution, destroy or tamper with evidence, and intimidate witnesses. *See* 18 U.S.C.

§ 2705(b)(2)-(5).  Because of such potential jeopardy to the investigation, there also exists a compelling governmental interest in confidentiality to justify the government's sealing request. *See Robinson*, 935 F.2d at 287-89.

10.    Based on prior dealings with Microsoft the United States is aware that, absent a court order under Section 2705(b) commanding Microsoft not to notify anyone about a legal request, it is Microsoft's policy and practice, upon receipt of a warrant seeking the contents of electronically stored wire or electronic communications for a certain account, to notify the subscriber or customer of the existence of the warrant prior to producing the material sought.

WHEREFORE, for all the foregoing reasons, the government respectfully requests that the above-captioned warrant, the application and affidavit in support thereof, and all attachments thereto and other related materials be placed under seal, and furthermore, that the Court command Microsoft not to notify any other person of the existence or contents of the above-captioned warrant (except attorneys for Microsoft for the purpose of receiving legal advice) for a period of one year or until further order of the Court.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: 8/1/2017

FILED

AUG - 1 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
EMAIL ACCOUNT
MCOHEN@TRUMPORG.COM

Case: 1:17-mj-00548
Assigned To : Howell, Beryl A.
Assign. Date : 8/1/2017
Description: Search and Seizure Warrant

## ORDER

The United States has filed a motion to seal the above-captioned warrant and related documents, including the application and affidavit in support thereof (collectively the "Warrant"), and to require Microsoft Corporation ("Microsoft"), an electronic communication and/or remote computing services headquartered at One Microsoft Way, Redmond, WA 98052 not to disclose the existence or contents of the Warrant pursuant to 18 U.S.C. § 2705(b).

The Court finds that the United States has established that a compelling governmental interest exists to justify the requested sealing, and that there is reason to believe that notification of the existence of the Warrant will seriously jeopardize the investigation, including by giving the targets an opportunity to flee from prosecution, destroy or tamper with evidence, and intimidate witnesses. *See* 18 U.S.C. § 2705(b)(2)-(5).

**IT IS THEREFORE ORDERED** that the motion is hereby **GRANTED**, and that the warrant, the application and affidavit in support thereof, all attachments thereto and other related materials, the instant motion to seal, and this Order be **SEALED** until further order of the Court; and

**IT IS FURTHER ORDERED** that, pursuant to 18 U.S.C. § 2705(b), Microsoft and its employees shall not disclose the existence or content of the Warrant to any other person (except attorneys for Microsoft for the purpose of receiving legal advice) for a period of one year or until further order of the Court.

THE HONORABLE BERYL A. HOWELL
CHIEF UNITED STATES DISTRICT JUDGE

August, 2019
Date

2